UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| DENISE RENA VERNON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 14-19-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| CAROLYN COLVIN, | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Plaintiff, Denise Rena Vernon, brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of an administrative decision of the Commissioner of Social Security (Commissioner) denying Vernon's application for disability insurance benefits (DIB) and supplemental security income (SSI). The Court, having reviewed the record and for the reasons set forth herein, will deny Vernon's Motion for Summary Judgment [R. 11] and grant the Commissioner's. [R. 14.]

**I**

Vernon filed applications for DIB and SSI on January 10, 2011. [Transcript (Tr.) 171-82.] She alleges a disability beginning on March 30, 2009, due to fibromyalgia, back pain, shortness of breath, organic mental disorder, and carpal tunnel syndrome. [Tr. 27.] Her date last insured is June 30, 2013. [Tr. 25.] Vernon's applications were denied initially in May 2011, and upon reconsideration in September 2011. [Tr. 25.] Subsequently, at Vernon's request, an administrative hearing was conducted before Administrative Law Judge (ALJ) George Evans on June 11, 2012. [Tr. 40-62.] Vernon, who was thirty-six years old as of the alleged onset date, has

a high school education and some college. [Tr. 32, 42.]. She has past relevant work as a paramedic and substitute cook, but the ALJ found that Vernon could no longer perform such work due to her impairments. [Tr. 32.]

In evaluating a claim of disability, an ALJ conducts a five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920.[1] First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. §§ 404.1520(b); 416.920(a)(4)(i). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(a)(4)(ii). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii). Before moving to the fourth step, the ALJ must use all the relevant evidence in the record to determine the claimant's residual functional capacity (RFC), which is an assessment of one's ability to perform certain physical and mental work activities on a sustained basis despite any impairment experienced by the individual. *See* 20 C.F.R. §§ 404.1520(e), 404.1545. Fourth, the ALJ must determine whether the clamant has the RFC to perform the requirements of his past relevant work, and if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. §§ 404.1520(e),

---

[1] The Sixth Circuit summarized this process in *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003):

> To determine if a claimant is disabled within the meaning of the Act, the ALJ employs a five-step inquiry defined in 20 C.F.R. § 404.1520. Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry, which is the focus of this case, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.

*Id.* at 474 (internal citations omitted).

416.920(a)(4)(iv). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. §§ 404.1520(f), 416.920(a)(4)(v).

In this case, at Step 1, the ALJ found that Vernon has not engaged in substantial gainful activity since March 30, 2009, the alleged onset date. [Tr. 27.] At Step 2, the ALJ found that Vernon has an overall "severe" impairment based on the following combined impairments: fibromyalgia, lumbar degenerative disc disease, shortness of breath, organic mental disorder, and carpal tunnel syndrome right. [*Id*.] At Step 3, the ALJ found that Vernon's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [Tr. 29.] The ALJ then considered the entire record and determined that Vernon possessed the residual functional capacity to perform "the full range of light unskilled work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)." [Tr. 30.] Based on the RFC, the ALJ found at Step 4 that Vernon is unable to perform any past relevant work. [Tr. 32.] At Step 5, the ALJ determined that application of the Medical-Vocational Rules directly supports a finding of "not disabled," and determined that based on Vernon's age, education, work experience, and residual functional capacity in conjunction with the Medical-Vocational Guidelines, a significant number of jobs in the national economy exist that Vernon could perform. [Tr. 33.] Accordingly, on August 30, 2012, the ALJ found that Vernon was not "disabled" and therefore is ineligible for DIB and SSI. [Tr. 33]. The Appeals Council declined to review the ALJ's decision [Tr. 1], and Vernon now seeks judicial review in this Court.

## II

This Court's review is limited to whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th

3

Cir. 2003); *Shelman v. Heckler*, 821 F.2d 316, 319-20 (6th Cir. 1987). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*) (quotes and citations omitted).

In determining the existence of substantial evidence, courts must examine the record as a whole. *Cutlip*, 25 F.3d at 286 (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983)). However, courts are not to conduct a *de novo* review, resolve conflicts in evidence, or make credibility determinations. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (citations omitted); *see also Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1228 (6th Cir. 1988). Rather, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion. *Ulman, 693 F.3d at 714*; *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

**A**

Vernon's primary argument on appeal is that the ALJ's reliance on the Medical-Vocational Guidelines without testimony from a vocational expert was inappropriate. [R. 11 at 7-12.] Although her argument focuses on the fifth step of the sequential evaluation process, it is more appropriately considered as a challenge to Vernon's RFC – a challenge integrally related to Vernon's other arguments concerning how the ALJ determined her RFC. Thus, the Court will

4

address Vernon's arguments by first examining whether substantial evidence supports the ALJ's finding concerning Vernon's RFC.

An individual's RFC is an administrative determination about the person's maximum ability to perform work-related activities and reflects the most that the person can do in a work-related setting despite his or her limitations. SSR 96-5p, 1996 WL 374183, at *5; 20 C.F.R. §404.1545(a)(1). This assessment "is based upon consideration of all relevant evidence in the case record," including medical evidence as well as the individual's own statements of what he or she can do. SSR 96-5p, 1996 WL 374183, at *5; 20 C.F.R. § 404.1545(a)(3). Given the role of the Court at this stage in the process, the key issue concerning Vernon's RFC is whether the ALJ's determination is supported by substantial evidence. *See* 42 U.S.C. § 405(g). As noted above, this Court must give deference to the Commissioner's decision "[e]ven if this Court might have reached a contrary conclusion of fact . . . so long as [the decision] is supported by substantial evidence." *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854-55 (6th Cir. 2010); *Ulman*, 693 F.3d at 714.

Here, the ALJ determined that despite Vernon's impairments, she has the ability to perform light, unskilled work as defined in 20 C.F.R. §§404.1527 and 416.967(b). [Tr. 30, 32.] Light work is defined as "lifting no more than 20 pounds at a time" or "carrying of objects weighing up to 10 pounds," and requires "a good deal of walking or standing," or "involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §404.1567(b). In making that determination, the ALJ considered the extent to which Vernon's alleged symptoms were consistent with the objective medical evidence and the opinion evidence in the record. Specifically, the ALJ considered the longitudinal treatment record, the

effectiveness of Vernon's treatment and medication, the opinion evidence of state agency physicians and psychological reviewers, and reports of consulting examiners. [Tr. 32.]

It is somewhat unclear from Vernon's brief what her exact criticism is of the ALJ's ultimate RFC finding. For instance, although Vernon asserts that she "is not able to work regularly," she does not point to medical evidence in the record that demonstrates she is incapable of light work or that would support a finding of complete disability. When re-formulating Vernon's arguments in light of the five-step sequential evaluation process, it appears that her primary challenges to the RFC determination are as follows: the ALJ did not adequately account for her non-exertional limitations, improperly assessed her subjective complaints, and gave too much weight to the opinions of state agency physicians.

### 1

In contending that the ALJ should not have relied on the Medical-Vocational Guidelines, Vernon essentially argues that the RFC should have included specific non-exertional limitations for her carpal tunnel syndrome, her fibromyalgia symptoms, and her lower back pain. [R. 11 at 7-12.] First, Vernon contends that her carpal tunnel syndrome (CTS) limits her ability to handle objects with her hands and to perform certain activities such as writing and crocheting. [R. 11 at 8-9.] Vernon, however, does not point to any medical evidence or opinions supporting that any non-exertional limitations from her CTS are not adequately addressed by her wearing wrist braces. The only medical report to which Vernon cites is from a treating rheumatologist on September 2, 2011 where the doctor listed "dropping of objects" as part of Vernon's illness history. [Tr. 507.] The ALJ, however, cited to the more recent report from the same doctor describing her treatment as "conservative" for CTS and mentions the effective treatment of wearing braces at night with no mention of dropping objects or other limitations. [Tr. 512.]

Second, Vernon claims the symptoms from her fibromyalgia result in non-exertional limitations such as generalized pain and lack of concentration [R. 11 at 9-10], and she merely asserts, without further explanation, that the ALJ "improperly assesses the impact of her fibromyalgia" and "incorrectly assesses the nature of the disease." [R. 11 at 12.] To the extent that Vernon bases her criticisms of the RFC on an improper understanding of fibromyalgia, the Sixth Circuit has found that "a *diagnosis* of fibromyalgia does not automatically entitle [the claimant] to disability benefits." *Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 754 (6th Cir. 2012) (quoting *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6hh Cir. 2008) (emphasis in original)). While acknowledging that a diagnosis of fibromyalgia presents "unique evidentiary difficulties," the court in *Torres* emphasized that the ALJ should focus on the specific limitations suffered by individual claimants. *Id*. In doing so, the court explained the important distinction between finding fibromyalgia to be a severe impairment, and finding that a particular claimant suffers from certain resulting limitations that render them completely disabled. *Id*. (citing *Sarchet v. Chater,* 78 F.3d 305 (7th Cir.1996), for the proposition that "[s]ome people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [claimant] is one of the minority.") The court affirmed the ALJ's determination that the claimant could perform "simple, unskilled work" because even though the record contained "conflicting evidence that would suggest further limitations," the ultimate decision was supported by substantial evidence that the claimant could perform certain activities of daily living despite her symptoms which "often improved with medication and treatment." *Id*. at 754. Similarly, the record here reflects that Vernon's primary treating physician described her fibromyalgia as "very well controlled" on her medications [Tr. 300], and the ALJ also found that she was able to perform certain activities of daily living. [Tr.

7

31.] Because the only support Vernon has for the severity and extent of her fibromyalgia symptoms consists of her own assertions, the ALJ also had to assess her credibility – a determination that is further discussed below.

Third, Vernon alleges that her lower back pain causes limitations in bending and crouching as well as generalized pain. [R. 11 at 11-12.] Contrary to Vernon's assertion, however, the ALJ did not ignore these problems but noted that Vernon was scheduled for a lumbar fusion operation that would likely result in "further improvement" in her limitations. [Tr. 31.] This assumption was confirmed by the medical report from August 2012 where Vernon told her doctor that most of her back pain was "completely resolved" after having the recommended surgery.[2] [Tr. 623.] Thus, the ALJ did not err by omitting extensive limitations related to her lower back pain.

**2**

Second, in an argument integrally related to the above issue concerning non-exertional limitations, Vernon argues that the ALJ improperly assessed her subjective complaints in determining her RFC, or in other words, that the ALJ erred in his credibility determination under 20 C.F.R. §§ 404.1529 and 416.929(c)(2). [R. 11 at 13-16.] Under the regulations, a claimant's "subjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability." *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 852 (6th Cir. 1986) (citing 20 C.F.R. § 404.1529); *see also* 42 U.S.C. § 423(d)(5)(A) ("[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability. . ."). There must also be objective medical evidence of an underlying condition supporting allegations of pain.

---

[2] Notably, Vernon fails to reference this report in her brief, and only cites to one earlier report from before she had the surgery. [Tr. 577.]

8

*Duncan*, at 852. In *Duncan*, the Sixth Circuit set out a two-part test for evaluating subjective complaints of pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

801 F.2d at 853. If the claimant establishes one of those requirements, the SSA regulations direct the ALJ to consider various factors in evaluating the claimant's subjective statements about the intensity and persistence of pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(a), (c)(2)-(3), 416.929(c). Such factors include the claimant's daily activities; location, duration, frequency, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain; treatment other than medication the claimant has received for pain; and any other measures the claimant uses to relieve the pain. *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3.

However, even when the medical records confirm the requisite objective medical condition supporting the claimant's complaints, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d 469, 475-76 (6th Cir. 2003) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Importantly, it is within the province of the ALJ, rather than the reviewing court, to evaluate the claimant's credibility. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir.2007) (citing *Walters,* 127 F.3d at 531). When considering the *Felisky* factors listed above, the Sixth Circuit has recognized that "determinations of credibility related to subjective complaints of pain rest with the ALJ and that

9

the ALJ's opportunity to observe the demeanor of the claimant is invaluable and should not be discarded lightly." *Duncan*, 801 F.2d at 852; *see also Walters*, 127 F.3d at 531 (stating that an ALJ's credibility assessment must "be accorded great weight and deference").

Here, the ALJ cited the correct test [Tr. 31] and found that although Vernon's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Vernon's own statements "concerning the intensity, persistence and limiting effects of these symptoms" were not entirely credible. [Tr. 31.] The ALJ set forth several direct examples to support that conclusion – examples which include most of the *Felisky* factors such as his consideration of Vernon's daily activities, her treatment and medication history, and how most of her alleged pain and other symptoms were well-managed or much-improved with medication or other treatment. [*Id.*; Tr. 419-20, 500-12, 590-96.] He noted test results and other reports showing that Vernon has normal range of motion of all joints, that improvement in her back pain was expected following scheduled surgery, and that her chest X-rays were all negative. [Tr. 31, 490-91, 576-79, 623.] The ALJ specifically noted that he carefully considered the evidence in the record as a whole, and that such evidence was inconsistent with Vernon's claims of constant and debilitating pain. For example, Vernon told one consultative physician she had difficulty writing or driving because of numbness in her fingers [Tr. 417], but during her examination with that same doctor in March 2011 she was able to pick up coins with either hand, write without difficulty, and displayed "no limitations" in her range of motion concerning her shoulders, elbows, wrists, or hands.[3] [Tr. 420.] Although Vernon complains of memory difficulties [Tr.

---

[3] The Court further notes that in Vernon's February 2011 Function Report, when asked if she could count change, she said she could not handle change very well when counting out money. [Tr. 229.] There are multiple such discrepancies in her claims of what she can and cannot do throughout the record.

10

49] and claims the ALJ did not fully account for her memory loss [R. 11 at 10], examining psychologist Dr. Maryman summarized his conclusions by stating that Vernon was "of sufficient intellectual ability. . . to understand, retain, and carry out a simple to more complex instruction and task," and believed "she should be reasonably able to carry out a work assignment adequately" and "be able to interact appropriately with fellow workers and supervisors." [Tr. 413.]  The ALJ also noted that Vernon's claim of "total disability" is inconsistent with her activities of daily living which include caring for her three children, some cooking, performing some household chores, and some shopping. [Tr. 31.]  Although Vernon testified at the hearing that she did not do any activities at all [Tr. 57], she also stated she is able to drive, has driven up to one hour at a time, and that she is able to cook although she uses a stool to sit on while doing so. [Tr. 31, 43-44; *see also* Tr. 123, 412.]  These inconsistencies are sufficient to support the ALJ's credibility assessment.  *See Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.").

Additionally, contrary to Vernon's assertion, the ALJ did not ignore limitations caused by her carpal tunnel syndrome, but rather noted that it "has been successfully treated with conservative braces and injections with few if any recommendations for surgical intervention." [Tr. 31, 469-72, 511-12.]  The ALJ further noted that Vernon was leaning heavily on her wrists during the hearing, which he believed was an indication that her condition was "not as painful or limiting as alleged." [Tr. 31.]  Vernon contends that an ALJ's personal observations of a claimant's ability to withstand pain at a hearing is not evidence of the absence of pain. [R. 11 at 11.]  The case to which Vernon cites as support for this contention, however, does not say that an ALJ's personal observations are irrelevant, but rather that "the ALJ must cite *some* other

11

evidence for denying a claim for pain in addition to personal observation." *Weaver v. Secretary of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1985) (emphasis in original). Here, the ALJ did not base his determination solely on his own observations, but rather listed it as one of many factors supporting his credibility assessment. Even if the ALJ should not have listed his personal observation here, any resulting error is harmless in light of the substantial evidence that supports his ultimate conclusion. *See Ulman*, 693 F.3d at 714.

Perhaps most importantly, although Vernon repeatedly accuses the ALJ of incorrectly assessing her abilities, activities, and the seriousness of her problems [R. 11 at 14-15], Vernon never explains how the ALJ failed to apply the appropriate legal standard or made a legal error in his assessment of her credibility. *See Rogers,* 486 F.3d at 247. Instead, Vernon relies only on her own assertions about her limitations which she previously made at the hearing and in her Function Reports, which in essence amounts to nothing more than circular reasoning. [*Id*. at 14-16 (citing Tr. 256-57, 261)]. Moreover, Vernon apparently ignores the fact that despite inconsistencies in her testimony, the ALJ still took care to note that he gave her subjective complaints due consideration by reducing her RFC from the medium work level suggested by the examining physicians. [Tr. 32, 413.]

The only argument Vernon makes that is based on law rather than mere disagreement with the ALJ's conclusions is her contention that the ALJ "improperly" relied on her Global Assessment Functioning (GAF) score. [R. 11 at 15.] A GAF score is based on a 100-point scale and represents a particular mental health professional's subjective opinion of the claimant's overall mental functioning. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 512 (6th Cir. 2006). "A GAF score may help an ALJ assess [a claimant's] mental RFC, but it is not raw medical data." *Id*. While a particular score may be useful in determining a claimant's RFC, one

GAF score alone is not an adequate basis for a decision to award or deny benefits, because the ultimate determination must be based on the record as a whole. *See Howard*, 276 F.3d at 24. Here, however, ALJ Evans simply mentioned Vernon's high GAF score as one of multiple factors he considered in his assessment of Vernon's credibility concerning the extent of her limitations [Tr. 31], but he did not rely solely on a GAF score in determining her RFC or in making his ultimate benefits decision.

Finally, Vernon's counsel offers several assertions that Vernon "is not lacking in motivation" and has made "great efforts to get better," along with various comments about her past career goals [R. 11 at 15], none of which demonstrate legal error in the ALJ's credibility assessment. Arguments reflecting mere disagreement with the ALJ's reasonable alternative interpretation of the evidence are not persuasive. *Hambrick v. Comm'r of Soc. Sec.*, 2014 WL 1961945, *7 (S.D. Ohio May 15, 2014). The Court should not re-weigh evidence or substitute its judgment for that of the ALJ in making credibility determinations. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Because the ALJ Evans employed the proper test and directly addressed factors that he was required to consider, the Court must give deference to his assessment. *See Rogers*, 486 F.3d at 247.

### 3

Vernon also asserts that the ALJ's reliance on the opinions of state agency doctors was "improper." [R. 11 at 16.] The Court disagrees. While more weight is generally given to the opinions of treating physicians than to those of non-examining medical sources, *see* 20 C.F.R. §§ 404.1527(d)(1), 416.927, "the opinions of non-examining state agency medical consultants have some value, and under certain circumstances can be given significant weight." *Branch v. Astrue*, 2010 WL 5116948, at *5 (N.D. Ohio Dec. 9, 2010). Non-examining sources are

regarded "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96-6p, 1996 WL 374180, *2. Thus, the opinions of one-time examining professionals, state agency doctors, and non-examining consultative professionals should be considered, and may be given some or even significant weight depending on the analysis of the same factors as those considered for treating physicians, such as supportability, consistency and specialization. 20 C.F.R. § 404.1572(d), (f); § 416.927(e); *see also* SSR 96-6p at *2-*3; *Branch*, 2010 WL 5116948, at *5. Indeed, the regulations instruct the ALJ to consider the opinions of state agency consultants and to explain his reasons for the weight given to them. 20 C.F.R. §§ 404.1527(e)(2)(i)-(ii), (f)(2), 416.927(e); SSR 96-8p, 1996 WL 374184, *7 ("[t]he RFC assessment must always consider and address medical source opinions").

Here, Vernon concedes that the ALJ only based his RFC determination "in part" on these opinions and also admits the ALJ only gave "some weight" to the state agency consultative opinions, but she does not explain how the ALJ erred in doing so. [R. 11 at 16, 17]. ALJ Evans explained his reasons for giving "some weight" to the state agency and consultative examiners because after examining the record as a whole he found that their opinions were "the product of thorough review of the medical evidence of record and were generally consistent with the longitudinal medical record." [Tr. 32.] It was particularly reasonable for ALJ Evans to give these opinions at least some weight in light of the fact that none of the treating physicians gave contrary opinions. *See, e.g., Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 294 (6th Cir. 2006); *see also Norris v. Comm'r of Soc. Sec.*, 461 F.App'x 433, 438-40 (6th Cir. 2012) (upholding weight given by ALJ to non-examining source when he explained and justified his decision and particularly when he explained that he found the state-agency physicians'

assessment to be consistent with the longitudinal treatment record).  Moreover, the ALJ clearly did not give these opinions controlling weight or uncritical deference since he specifically disagreed with the state agency doctors' opinions that Vernon could perform medium work and reduced the RFC to light unskilled work – a fact that Vernon appears to ignore.  [Tr. 32.]

Vernon particularly criticizes the ALJ's consideration of consulting psychologist Dr. Maryman's findings because Dr. Maryman assessed Vernon from a psychological perspective rather than focusing on her physical ailments. [R. 11 at 16.]  There is nothing, however, improper about the ALJ considering this opinion since one of Vernon's combined impairments found to result in an overall "severe" impairment is organic mental disorder with memory loss.[4]  [Tr. 27, 29.] Moreover, the ALJ discussed Dr. Maryman's opinion within the context of his *credibility* assessment of Vernon's complaints.  Doctor Maryman's opinion focuses on Vernon's social skills, concentration level, ability to follow directions and manage funds, and overall mental health in light of her cognitive disorder NOS and any mental effects from her fibromyalgia.  [Tr. 409-14.]  This information is highly relevant to Vernon's ability to function in a workplace environment and is pertinent to her complaints, in addition to being properly considered in the context of assessing her credibility.

Finally, Vernon appears to argue that no weight should be given to state agency physicians and consultative examiners because they do not refer to her carpal tunnel syndrome or lower back problem.[5] [R. 11 at 17.]  First, this is incorrect because Dr. Lange's report

---

[4] Although her counsel asserts that Vernon "does not claim a mental health problem" [R. 11 at 12], the record contains numerous references to Vernon's complaints of difficulties with memory loss, lack of concentration, and symptoms of "fibro fog."  It is therefore proper to consider a psychological assessment of her intellectual abilities.

[5] Vernon argues that giving "some" weight to Dr. Haziq's opinion was improper because he examined her in March 2011 before she was diagnosed with carpal tunnel syndrome or fibromyalgia, but this argument fails on its face

specifically discussed Vernon's carpal tunnel syndrome and also reviewed the MRI results of her cervical and lumbar spine. [Tr. 121.] Second, this contention is irrelevant because ALJ Evans discussed both impairments, addressed the limitations resulting from each, and found them to be two of several impairments which together constituted an overall "severe" impairment. [Tr. 27-30.] In doing so, the ALJ also referenced Vernon's records from treating physicians. [*Id*.] There is no reason to believe that the ALJ did not adequately assess these impairments simply because the consultative examiners did not discuss them as extensively as Vernon wished.

**B**

Having determined that substantial evidence exists to support the ALJ's RFC determination, the Court will now address Vernon's complaint that the ALJ improperly relied on the Medical Vocational Guidelines at Step 5 of the process instead of using vocational expert testimony. [R. 11 at 7-12.] At Step Five in the sequential evaluation process, the ALJ may determine that a sufficient number of jobs exist in the national economy that the claimant can perform by relying either on the testimony of a vocational expert or by relying on the Medical Vocational Guidelines ("the grids"). 20 C.F.R. §§ 404.1566(d)-(e), 416.962. Reliance on vocational expert testimony instead of the Guidelines "is required only if 'the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate residual functional capacity level. . . .'" *Cole v. Sec'y of Health & Human Servs*., 820 F.2d 768, 772 (6th Cir. 1987) (quoting *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524, 528-29 (6th Cir. 1981)). The Commissioner may not apply the "Grids" if the claimant suffers from nonexertional impairments. *Id*. However, "[a] mere allegation of a nonexertional limitation is not sufficient to

---

because Dr. Haziq's report specifically acknowledges that Vernon was diagnosed with fibromyalgia in 2009, and also discusses her carpal tunnel syndrome. [Tr. 416-17, 421.]

16

preclude application of the grid; the determining factor is whether the alleged nonexertional impairment is severe enough to alter the conclusion that the claimant could do [the level of work in the RFC]." *Id.*; *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008). The Sixth Circuit has "traditionally considered the term 'nonexertional' to encompass mental, sensory, or environmental limitations." *Cole*, 820 F.2d at 772; 20 C.F.R. § 404, Subpart P, Appendix 2.

Here, Vernon's RFC does not include any non-exertional limitations. As discussed above, that determination is supported by substantial evidence. To the extent that Vernon's allegations of non-exertional limitations depend on the assessment of her credibility, the ALJ did not err in finding that her complaints were not entirely credible. Moreover, even despite that finding, the ALJ particularly addressed Vernon's subjective complaints about her limitations by lowering the RFC suggested by state agency doctors. Therefore, vocational expert testimony was not required, and it was appropriate for the ALJ to rely on the Guidelines.

## III

As explained above, this Court is limited to a determination of whether the ALJ's decision "is supported by substantial evidence and was made pursuant to proper legal standards." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (citing *Rogers*, 486 F.3d at 241). Here, substantial evidence supports the ALJ's finding that Vernon is not completely disabled and that a significant number of jobs exist in the national economy in which Vernon may work and meaningfully contribute to society. Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Plaintiff's Motion for Summary Judgment [R. **11**] is **DENIED**;

2. Defendant's Motion for Summary Judgment [**R. 14**] is **GRANTED**; and

3. **JUDGMENT** in favor of the Defendant will be entered contemporaneously

herewith.

This the 2nd day of March, 2015.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge